[Cite as *State v. Springs*, 2016-Ohio-5323.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 103539**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## LANERON D. SPRINGS

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-15-592930-A

**BEFORE:** Kilbane, J., E.A. Gallagher, P.J., and Stewart, J.

**RELEASED AND JOURNALIZED:** August 11, 2016

**ATTORNEY FOR APPELLANT**

Rick L. Ferrara
2077 East 4th Street
Second Floor
Cleveland, Ohio 44114

**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
Sherrie S. Royster
Assistant County Prosecutor
The Justice Center - 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

MARY EILEEN KILBANE, J.:

{¶1} Defendant-appellant, Laneron Springs ("Springs"), appeals from his rape conviction. Having reviewed the record and the controlling case law, we affirm.

{¶2} On February 4, 2015, Springs was indicted in a six-count indictment in connection with an alleged assault upon A.H. Count 1 charged him with rape in violation of R.C. 2907.02(A)(1)(c) (alleging vaginal intercourse when victim's ability to consent was substantially impaired). Count 2 charged him with rape, in violation of R.C. 2907.02(A)(2) (alleging vaginal sexual intercourse by force or threat of force). Count 3 charged him with rape in violation of R.C. 2907.02(A)(1)(c) (alleging anal sexual intercourse when victim's ability to consent was substantially impaired). Count 4 charged him with rape in violation of R.C. 2907.02(A)(2) (alleging anal sexual intercourse by force or threat of force). Count 5 charged him with gross sexual imposition in violation of R.C. 2907.05(A)(1) (sexual contact by force or threat of force). Count 6 charged him with kidnapping in violation of R.C. 2905.01(A)(4), with a sexual motivation specification. Counts 1-4 and 6 also contained notice of prior conviction specifications pursuant to R.C. 2929.13(F)(6) and repeat violent offender specifications pursuant to R.C. 2941.149(A). Springs waived his right to a jury trial as to the specifications, and the remaining charges proceeded to a jury trial on July 13, 2015.

{¶3} A.H., the complaining witness, testified that on her 21st birthday in May 2014, she had dinner with her family and several friends, including S.P. Later that night,

V.R., her close friend and the godmother of her son, invited A.H. out to celebrate her birthday. According to A.H., V.R. originally planned to celebrate her cousin's birthday with some friends, which included Springs. Since A.H.'s birthday was around the same time, V.R. decided to celebrate both birthdays and included A.H. "at the last minute." After accepting the invitation, A.H. informed her live-in boyfriend, A.M., that she was going out.

{¶4} A.H. and S.P. met V.R. at her home at around 10:00 p.m. At this time, A.H. was wearing a body-shaper, which is similar to a one-piece bathing suit, shorts, a shirt, and a blazer. The group then went to the Executive Lounge.

{¶5} A.H. testified that the group purchased a bottle of dark-colored liquor and a bottle of light-colored liquor at the club and provided her with drinks throughout the evening to celebrate her birthday. A.H. had consumed alcohol only on one or two prior occasions. On that night, she did not remember how much alcohol she consumed, but she stated that she became drunk and felt dizzy. A.H. danced with S.P., and other people at the bar, including Springs, and she acknowledged that she was "grinding" against him.

{¶6} Later, a group of about 12 people returned to V.R.'s home. V.R. immediately went upstairs to her bedroom to go to sleep. A.H. and S.P. were first on the sofa downstairs, but then decided to go upstairs to bed. According to A.H., they stumbled up the stairs and went to V.R.'s bedroom, where two queen-size beds had been pushed together to make one large bed. V.R. was "in and out of it" on the far left of the

beds. A.H. got in the same bed that V.R. was in, but she was not immediately next to her. A.H. was wearing her shorts, shirt, and body-shaper, and was "in and out of it" at the time. The prosecutor asked if "in and out of it" meant intoxicated. A.H. answered "yes." She recalled that she fell asleep just after Springs came to the room and yelled about the rest of the guests refusing to leave.

{¶7} A.H. next testified that she, V.R., S.P., and Springs all fell asleep on the bed, and that she was between V.R. and Springs. A.H. testified that she was drunk and wanted to go to sleep, and she did not consent to having sex with anyone at the gathering and did not consent to sexual activity with Springs — she simply slept. At some point, S.P. went into the bathroom, and A.H. woke up. A.H. noticed that her shorts were at her knees, and her body-shaper was moved to one side, exposing her vagina, buttocks, and left breast. A.H. testified that she "felt weird in [her] anal area" and "felt like [she] had been messed up with." She believed that she had been penetrated and began to yell at Springs, demanding to know why her clothing was askew. Springs did not respond to A.H.; instead, he responded to S.P. that "[A.H.] is trying to say that I raped her. I was just trying to help her get comfortable for bed."

{¶8} A.H. awoke V.R. and complained to her about what had happened. A.H. and S.P. then drove to the fifth district police station to report that she had been assaulted at V.R.'s home by one of V.R.'s friends. Police officers advised A.H. to go to the hospital. The women drove to Euclid Hospital, but then were directed to go to Hillcrest Hospital for a rape kit examination. A.H. then went to Hillcrest Hospital, and the

examination was completed and the rape kit evidence was collected. A.H. informed the examination nurse and a Cleveland police detective that she had consensual sex with her boyfriend prior to being assaulted.

{¶9} A.H. testified that she did not consume any additional alcohol after returning to V.R.'s house. She also admitted that V.R. does not believe her account of the incident, stating that V.R. sent S.P. a photograph of Springs's penis and maintained that Springs could not have engaged in sexual conduct without A.H.'s knowledge. A.H. also stated that she had pain in her anus after the assault, but she was not certain if there had been vaginal penetration.

{¶10} S.P. testified that while at the Executive Lounge, A.H. and the rest of the group drank 1800 Tequila and Hennessy. A.H. had "a lot to drink but was not overbearing." S.P. did not want to get separated from A.H., so she stayed with her throughout the evening. After the group returned to V.R.'s home, she and A.H. sat on the couch together then decided to go up to V.R.'s bedroom where V.R. was already asleep on the left side of the combined beds. A.H. went to sleep next to V.R., and S.P. went to sleep on the right side of the combined beds. Springs later got into the bed next to A.H.

{¶11} S.P. testified that she went to the bathroom and Springs followed her and asked if she was okay. S.P. said that she was okay and closed the bathroom door. Later, when she exited the bathroom, A.H. was yelling and demanding to know why her "pants were down." S.P. and A.H. then gathered their belongings and went to the police

station closest to V.R.'s house. From there, they were directed to a different station in Cleveland where an officer took a report from A.H. and instructed her to go to the hospital. S.P. further testified that after the night of the birthday celebration, V.R. sent her a text message containing a photograph of Springs's penis. In the message, V.R. stated that she did not believe that A.H. had been assaulted.

{¶12} V.M., A.H.'s cousin, testified that she was part of the group that celebrated A.H.'s birthday at the Executive Lounge. While at the lounge, A.H. became "sluggish," "not herself," and intoxicated. V.M. questioned A.H. as to why she was drinking both "light" and "dark" liquor, and she replied that she was drinking what others in the group were giving her. At that point, V.M. instructed A.H. to stop drinking.

{¶13} L.L., A.H.'s mother, testified that on the day of the incident, A.H. had gone to dinner with her and other family members. After learning of the incident, L.L. met A.H. in the emergency room of Hillcrest Hospital. L.L. stated that A.H. appeared nervous when she first walked in, but L.L. attributed that to A.H. not knowing how she was going to react. She further stated that A.H. also appeared numb and "out of it."

{¶14} D.T., A.H.'s grandmother, testified that after the dinner with family members, A.H. had plans to celebrate later that night with V.R. and some friends. The next morning, D.T. received a call from A.H. A.H. was upset and asked D.T. to meet with her at the police station. D.T. arrived at the police station, and then took A.H. to Euclid Hospital. From there, A.H. was sent to Hillcrest Hospital for completion of a rape kit examination.

{¶15} Cleveland Police Officer Adonna Perez ("Officer Perez") testified that she is assigned to the fifth district. At approximately 6:00 a.m. on May 4, 2014, Officer Perez took a "lobby report" from A.H. who was with S.P. A.H. reported that she had been raped when she fell asleep after a party. A.H. provided the officer with the name of the assailant and the address of a party she had attended earlier. Officer Perez instructed A.H. to go to the hospital for a rape examination.

{¶16} Christine LaPrairie ("LaPrairie"), a Sexual Assault Nurse ("SANE") since 2002, testified that she works at Hillcrest Hospital, and she examined A.H. According to LaPrairie, A.H. noted that she had consensual sex with her boyfriend the previous day, and then went out to celebrate her 21st birthday with "her friend's sister." A.H. indicated that she is not a drinker so she did not know the names of the alcoholic beverages that she consumed, but she stated that she had two or three "Dixie cup"-size drinks. The group returned to the friend's residence and somewhere between 4:00 a.m. and 5:00 a.m., she had a "memory loss" and noticed that the body-shaper that she had on was "hiked up" on one side, and her pants were undone. She also reported that her "anus felt sore" and her left breast was exposed. She described an altercation involving a male who had been lying behind her.

{¶17} LaPrairie collected A.H.'s clothing. She also took anal and vaginal swabs and a swab of her left breast. LaPrairie documented that A.H. had an "anal tear." LaPrairie did not order any alcohol testing because A.H. was "alert and oriented" during the examination.

{¶18} Christine Scott, a forensic DNA analyst with the Cuyahoga County Medical Examiner's Office, testified that "seminal material" or the "liquid portion that is not sperm" was found in the vaginal and anal swabs. A.H.'s vaginal swab revealed DNA from A.H.'s boyfriend, and excluded Springs. DNA analysis of the anal swab indicated that Springs "could not be excluded" as a contributor to the sample and that the probability of selecting an unrelated individual at random as a possible contributor to the sample was 1 in 3 billion among the African American population. In addition, the major DNA component from the swab taken of A.H.'s left breast matches the DNA profile for Springs.

{¶19} V.R. testified that she is friends with Springs, who lives in Pittsburgh. Springs arrived in Cleveland the day before the party. V.R. and Springs had sex during this visit, and Springs intended to stay until the following Monday. On the night of the party, the group had two bottles of Hennessy and a bottle of 1800 Tequila. V.R. stated that A.H. drank, but she was "not overly drunk." V.R. stated that A.H. was "dancing on him on his lap a little bit hugging on him," doing a "bootie dance" and "twerking." When the group returned to V.R.'s house, V.R. was intoxicated so she went to sleep in her room. V.R. described her bed as "bigger than a country size king." A.H. and S.P. also went to V.R.'s room to sleep in her bed as Springs tried to get other guests to leave the house.

{¶20} V.R. next testified that she was awakened by A.H. shaking her and yelling that Springs had raped her. At that point, Springs stated that he could not believe what

was happening, and A.H. and S.P. then left. Springs decided to cut his visit short, and V.R. drove him to the bus station. After that, V.R. admitted that she sent S.P. a text message that contained a picture of Springs exposed and indicated that she did not believe A.H.'s allegations.

{¶21} Cleveland Police Detective Cynthia Bazilius ("Detective Bazilius") testified that she took a statement from A.H. and obtained buccal swabs from her boyfriend for purposes of DNA analysis. When Detective Bazilius contacted V.R. in order to learn the name of the individual described by A.H., V.R. gave her an incorrect name, but she eventually provided Springs's phone number. Detective Bazilius obtained buccal swabs from Springs.

{¶22} At the conclusion of its case, the state dismissed Count 1 (alleging vaginal sexual conduct where the victim was substantially impaired), Count 2 (alleging vaginal sexual conduct by force), and all of the notices of prior conviction and repeat violent offender specifications of the indictment. The defense did not present witnesses. The jury subsequently convicted Springs of rape as alleged in Count 3 (alleging anal sexual intercourse where the victim was substantially impaired) and acquitted him of the remaining charges. The trial court sentenced Springs to four years of imprisonment and five years of postrelease control. The court additionally classified Springs as a Tier III sex offender, who must register every 90 days for life.

{¶23} Springs now appeals, assigning five errors for our review. For the sake of clarity, we shall address some of the assigned errors out of their predesignated order.

The trial court committed plain error in failing to properly instruct the jury on the proper definition of substantially impaired, depriving [Springs] of due process under the United States and Ohio Constitutions and Ohio law.

## Assignment of Error Two

Insufficient evidence supported [Springs's] conviction for rape where the state failed to present sufficient evidence to establish that the alleged victim was substantially impaired, and that [Springs] acted knowingly despite that impairment.

## Assignment of Error Three

The manifest weight of the evidence did not support a conviction of rape where the evidence showed that [Springs] was not substantially impaired and that [Springs] acted knowingly despite that impairment.

## Assignment of Error Four

Defense counsel provided constitutionally ineffective assistance at trial, failing to properly define "substantially impaired" in the jury instructions.

## Assignment of Error Five

The state committed prosecutorial misconduct by wrongly impugning the integrity of defense counsel during closing arguments.

## Sufficiency of the Evidence

{¶24} In the second assignment of error, Springs argues that there is insufficient evidence to support his rape conviction.

{¶25} An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial and determine whether such evidence, if believed, would convince the average mind of the

defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. *See also State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541.

{¶26} Springs was convicted of rape in violation of R.C. 2907.02(A)(1)(c), which provides as follows:

(A)(1)   No person shall engage in sexual conduct with another who is not the spouse of the offender * * *, when any of the following applies:

(c)   The other person's ability to resist or consent is substantially impaired because of a mental or physical condition * * *, and the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired because of a mental or physical condition[.]

{¶27} An individual's conduct becomes criminal under R.C. 2907.02(A)(1)(c) when he or she engages in sexual conduct with an intoxicated victim when that individual knows or has reasonable cause to believe that the victim's ability to resist or consent is substantially impaired because of voluntary intoxication. *In re King*, 8th Dist. Cuyahoga Nos. 79830 and 79755, 2002-Ohio-2313, ¶ 22.

{¶28} "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). Whether a defendant acted "knowingly" must be inferred from the

totality of the circumstances surrounding the alleged offense. *State v. Jones*, 8th Dist. Cuyahoga No. 101311, 2015-Ohio-1818, ¶ 42.

{¶29} In *State v. Zeh*, 31 Ohio St.3d 99, 509 N.E.2d 414 (1987), the Ohio Supreme Court observed that "[t]he phrase 'substantially impaired,' in that it is not defined in the Ohio Criminal Code, must be given the meaning generally understood in common usage." *Id.* at 103. The *Zeh* court held that "substantial impairment must be established by demonstrating a present reduction, diminution or decrease in the victim's ability, either to appraise the nature of his conduct or to control his conduct." *Id.*

{¶30} This court has found that voluntary intoxication is a mental or physical condition that could cause substantial impairment. *Jones* at ¶ 43, citing *State v. Doss*, 8th Dist. Cuyahoga No. 88443, 2008-Ohio-449, ¶ 13; *In re King* at ¶ 22. This can include, but does not require, evidence that the victim was unconscious at the time of the sexual conduct. *In re King* at ¶ 20. *Accord State v. Hatten*, 186 Ohio App.3d 286, 2010-Ohio-499, 927 N.E.2d 632, ¶ 50 (2d Dist.) (evidence that should have alerted defendant to a victim's substantial impairment may include evidence that the victim was "stumbling, falling, slurred speech, passing out, or vomiting.").

{¶31} In *In re King,* this court affirmed the trial court's finding a juvenile offender delinquent of sex offenses involving a substantially impaired victim. In that case, the evidence demonstrated that King engaged in sexual conduct with the victim after she consumed six to eight alcoholic drinks with King, and then fell asleep in his basement. The court stated:

[T]he victim's ability to resist or consent was substantially impaired by reason of voluntary intoxication, which [the offenders] fostered. We * * * hold the victim in this case could not have consented to what occurred. Furthermore, [the offenders] were aware of her inability to consent because of her intoxicated state. Here her voluntary intoxication does not control the outcome of the case. The outcome of the case is controlled by her lack of consent and to what extent the alcohol impaired her ability to give consent.

*Id*. at ¶ 24.

{¶32} Similarly, in *Jones* this court held:

Sexual conduct with an intoxicated person under the Revised Code becomes criminal when the victim's "ability to resist or consent is substantially impaired by reason of voluntary intoxication." *In re King* at ¶ 22, citing *State v. Martin*, 12th Dist. Brown No. CA99-09-026, 2000 Ohio App. LEXIS 3649 (Aug. 14, 2000). Substantial impairment can be demonstrated by the testimony of those who have interacted with the victim. *State v. Brady,* 8th Dist. Cuyahoga No. 87854, 2007-Ohio-1453, ¶ 78. Additionally, whether an offender knew or had reasonable cause to believe a victim was impaired may be reasonably inferred from a combination of the victim's demeanor and others' interactions with the victim. *State v. Novak*, 11th Dist. Lake No. 2003-L-077, 2005-Ohio-563, ¶ 25.

*Id.* at ¶ 43. Applying those principles, the *Jones* court held that there was sufficient evidence demonstrating that the victim was substantially impaired and that Jones had reasonable cause to believe the victim was substantially impaired, where the evidence demonstrated that the victim had consumed numerous shots of tequila and other alcoholic

beverages and was unconscious when the police discovered the defendant engaging in sex with her.

{¶33} Similarly, in *State v. Jones*, 8th Dist. Cuyahoga No. 98151, 2012-Ohio-5737, this court affirmed the defendant's conviction for rape where the evidence established that it was "obvious" that the victim was inebriated, she required assistance from Jones to walk, she "passed out" more than once, and "Jones was in the victim's vicinity the entire evening." *Id*. at ¶ 44.

{¶34} Conversely, in *State v. Schmidt*, 8th Dist. Cuyahoga No. 88772, 2007-Ohio-4439, this court found that there was insufficient evidence to prove that the defendant was aware that the alleged victim's ability to control her conduct was substantially impaired, and reversed a conviction for sexual battery. In *Schmidt*, the court explained that:

> There is nothing in this record that would enable a trier of fact to reasonably conclude that defendant was aware that JG was substantially impaired to the point that it affected her ability to control his or her conduct. While JG may very well have intended to stop short of engaging in vaginal intercourse with defendant and subjectively felt substantially impaired during her sexual activities, we cannot conclude that defendant knew of JG's condition beyond a reasonable doubt. While she testified that she said "no," she also testified that she repeatedly continued to engage in very intimate consensual sexual activity with defendant. She said nothing to defendant following the incident. And, the other person, who was present in the bathroom during the entire incident, did not hear any conflict between defendant and JG. The outward signs JG exhibited indicated that she was aware of her surroundings, was able to operate her vehicle, park it by the hotel, and walk and talk in a "normal" fashion. While JG claims she might have been in and out of consciousness, there is no evidence that defendant noticed this. Further, JG had specific recall of all the events of that night, with the sole exception of the very moment defendant engaged in vaginal intercourse. Moments after the encounter with defendant, she described

being able to employ a relatively elaborate plan to find her friend's whereabouts in the hotel. Then, she got back in her car and drove home without difficulty.

*Id.* at ¶ 46.

{¶35} In this matter, after viewing the evidence in a light most favorable to the prosecution, we find that a rational trier of fact could conclude that Springs engaged in anal intercourse with A.H. while her ability to resist or consent was substantially impaired. A.H., S.P., and V.M. provided clear, consistent and compelling testimony that A.H., who ordinarily does not drink alcohol, drank "dark" and "light" liquor while at the Executive Lounge, and became intoxicated. At that point, V.M. became alarmed at A.H.'s alcohol consumption and advised her to stop drinking. Later, when A.H. arrived at V.R.'s home, she was still drunk, and got into the bed in her party clothes to go to sleep. A.H., V.R., and S.P. were in the bed, and Springs also got into bed, but A.H. testified that she did not consent to sexual relations with him or anyone else, and then she went to sleep.

{¶36} When she awoke, her shorts were down at her knees. Her other clothing, including her body-shaper, were pushed to one side, exposing her left breast, vagina, and buttocks. A.H. immediately accused Springs of raping her and went directly to the police department and to two different hospitals in order to report the attack and get a rape kit examination. A.H. reported to the SANE nurse that she had been drinking and had no memory of what had happened, but she felt pain in her anal area. Springs's DNA was found on her left breast and he could not be excluded from the sample recovered from the anal swab that contained seminal material.

**{¶37}** From the foregoing, a rational jury could conclude that Springs engaged in sexual conduct with A.H., that her ability to resist or consent was substantially impaired by reason of voluntary intoxication, and that she did not consent to the sexual relations. A rational jury could also conclude that Springs knew or had reasonable cause to believe that A.H. was substantially impaired in light of the clear evidence regarding the type and amount of alcohol that she consumed, her intoxicated demeanor, others' interactions with her, and the fact that she went to sleep in her party clothes after the group arrived home.

**{¶38}** Therefore, the second assignment of error is overruled.

<u>Manifest Weight of the Evidence</u>

**{¶39}** In his third assignment of error, Springs argues that his conviction for rape is against the manifest weight of the evidence.

**{¶40}** In *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541, the Ohio Supreme Court described a challenge to the manifest weight of the evidence supporting a conviction as follows:

> Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a

question of mathematics, but depends on its *effect in inducing belief*."
(Emphasis added.)   *Black's* [*Law Dictionary* 1594 (6 Ed.1990)].

When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "'thirteenth juror'" and disagrees with the factfinder's resolution of the conflicting testimony.   [Quoting *Tibbs v. Florida*, 457 U.S. 31, 45, 102 S.Ct. 2211, 2220, 72 L.Ed.2d 652   (1982)].   *See also State v. Martin* (1983), 20 Ohio App.3d 172, 175, * * *, 485 N.E.2d 717, 720-721 ("The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.   The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.").

*Id.*

{¶41} In this matter, after reviewing the evidence, we cannot say that this is one of the exceptional cases where the evidence weighs heavily against the conviction.   The record clearly demonstrates that A.H. consumed strong alcoholic beverages while at the Executive Lounge, and that V.M. became alarmed at her drinking.   When she returned to V.R.'s home, she was still drunk, and got into the bed in her party clothes to go to sleep.

Springs got into the bed, but A.H. consistently testified that she did not consent to sexual conduct with him or anyone else at the party and just wanted to got sleep. She awoke to find her shorts down at her knees, and her body-shaper pushed to one side, exposing her left breast, vagina, and buttocks. She immediately accused Springs of raping her and went to the police station to report being assaulted. She also reported the assault at Euclid and Hillcrest Hospitals. An analysis of the rape kit evidence indicated that Springs cannot be excluded as a contributor to the anal swab and that he was the contributor to the swab from A.H.'s left breast. Therefore, we find that the jury did not create a manifest injustice by concluding that Springs was guilty of rape as charged in Count 3 of the indictment. We conclude that the trier of fact, in resolving the conflicts in the evidence, did not create a manifest injustice to require a new trial.

**{¶42}** Therefore, Springs's third assignment of error is overruled.

### Jury Instruction on Substantially Impaired

**{¶43}** In his first assignment of error, Springs complains that the trial court unlawfully defined the term "substantially impaired" as "any degree of impairment, rather than as a substantial degree of impairment," thus lowering the state's burden of proof.

**{¶44}** As an initial matter, we note that defendant did not object to this instruction. Accordingly, it will be reviewed for plain error. Crim.R. 52; *State v. Long*, 53 Ohio St.2d 91, 94, 372 N.E.2d 804 (1978). An erroneous jury instruction does not constitute plain error unless, but for the error, the outcome of the trial clearly would have been otherwise. *State v. Cooperrider*, 4 Ohio St.3d 226, 227, 448 N.E.2d 452 (1983).

**{¶45}** In this matter, the trial court instructed the jury as follows:

Before you can find the defendant guilty, you must find beyond a reasonable doubt that on or about the 4th day of May in 2014 in Cuyahoga County, that the defendant, Laneron Springs, did engage in sexual conduct, to wit: anal intercourse with [A.H.], who was not his spouse, and the ability of [A.H.] to resist or consent was substantially impaired because of a mental or physical condition or because of advanced age, and the defendant knew or had reasonable cause to believe that [A.H.]'s ability to resist or consent was substantially impaired because of the mental or physical condition or because of advanced age.

So I'd like to define a number of the concepts that I just read to you.    * * *

Consent, which is an issue in this case, consent may be either express or implied.    Expressed consent is determined by the written or spoken words of the persons involved.

Implied consent is determined by the circumstances which surround those involved including their words and acts from which the jury may infer that consent was given to the defendant, and that rests upon your shoulders, that determination.

Let's talk about the additional concept of lack of capacity.    A person lacks capacity to consent when in this case she is impaired for any reason to the extent that she lacks sufficient understanding or capacity to make or carry out reasonable decisions concerning herself or her resources.

Substantially impaired means a present reduction, diminution or decrease in the victim's ability either to appraise the nature of the conduct or to control her conduct.

**{¶46}** We recognize that this instruction does not meet 4 Ohio Jury Instructions 165, Section 507.02, which states: "'Substantially impair' means to interfere with the other person's judgment or control in a significant manner."    *Accord State v. Kebe*, 8th Dist. Cuyahoga No. 73398, 1998 Ohio App. LEXIS 5410 (Nov. 12, 1998).    However, as

noted in *Zeh*, "substantially impair" means "a present reduction, diminution or decrease in the victim's ability, either to appraise the nature of his conduct or to control his conduct."

Therefore, we conclude that the trial court's instruction adequately meets the language set forth in *Zeh*. In any event, the evidence in this case demonstrated that A.H. was asleep at the time of the sexual intercourse. Thus, we are unable to conclude that but for an error in further defining "substantially impaired," the outcome of the trial clearly would have been otherwise.

{¶47} Therefore, the first assignment of error is overruled.

Ineffective Assistance of Counsel

{¶48} In the fourth assignment of error, Springs complains that his trial counsel was ineffective when he failed to object to the trial court's instructions regarding the term "substantially impaired."

{¶49} In order to prevail on an ineffective assistance of counsel claim, appellant must demonstrate that trial counsel's performance fell below an objective standard of reasonable representation, and there is a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus, adopting the test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). If a claim can be disposed of by showing a lack of sufficient prejudice, there is no need to consider the first prong, i.e., whether trial counsel's performance was deficient. *Id.* at

142, citing *Strickland* at 695-696. There is a general presumption that trial counsel's conduct is within the broad range of professional assistance. *Id*. at 142-143.

**{¶50}** Having determined that the instruction on "substantially impaired" did not create plain error, the claim of ineffective assistance premised upon the failure to object to this instruction must likewise fail. *State v. Henderson*, 39 Ohio St.3d 24, 33, 528 N.E.2d 1237 (1988).

**{¶51}** Therefore, the fourth assignment of error is overruled.

Prosecutorial Misconduct

**{¶52}** In the fifth assignment of error, Springs argues that the prosecuting attorney engaged in misconduct in final summation when she countered the defense argument regarding the sober appearance of the victim in a manner that imputed insincerity to defense counsel and accused defense counsel of trying to confuse the jury.

**{¶53}** In deciding whether a prosecutor's comments rise to the level of prosecutorial misconduct, a court must determine whether the prosecutor's actions were improper, and, if so, whether the defendant's substantial rights were actually prejudiced. *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). "[A] judgment may only be reversed for prosecutorial misconduct when the improper conduct deprives the defendant of a fair trial." *State v. Carter*, 72 Ohio St.3d 545, 557, 1995-Ohio-104, 651 N.E.2d 965. In examining a prosecutor's comment, the issue is whether but for the prosecutor's misconduct the verdict would have been otherwise. *State v. Johnson*, 46 Ohio St.3d 96, 102, 545 N.E.2d 636 (1989) The touchstone of the analysis is the

fairness of the trial, not the culpability of the prosecutor. *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 140.

**{¶54}** In this matter, Springs complains that the prosecuting attorney committed prejudicial misconduct by arguing as follows:

> Ladies and gentlemen, perhaps the most offensive thing that you just heard come out of defense counsel's mouth was him standing here telling you how a rape victim is supposed to act. I would submit to you that all defense counsel was trying to do is muddy the waters for you.
>
> Defense counsel also told you [that] you didn't hear testimony that [A.H] was so drunk that she smelled of alcohol, that she was falling over. Once again trying to paint this picture for you trying to muddy the waters about what someone should look like.

**{¶55}** Springs argues that this matter is analogous to *State v. Keenan*, 66 Ohio St.3d 402, 613 N.E.2d 203 (1992). In *Keenan*, the Ohio Supreme Court concluded that the prosecuting attorney engaged in prejudicial misconduct where he "imputed insincerity to defense counsel," disparaged defense counsel in the presence of the jury, "substituted emotion for reasoned advocacy," interjected his personal opinion into the proceedings, and "used the bad character of Keenan's friends to attack Keenan's own character." *Id.* at 409.

**{¶56}** We recognize that a prosecuting attorney should not accuse defense counsel of intentionally "muddying the waters." However, we do not find that the extent of the

prosecutor's remarks or the tone of the remarks can fairly be compared to the remarks condemned in *Keenan*. Moreover, we cannot conclude that the remarks deprived Springs of a fair trial.

**{¶57}** Therefore, the fifth assignment of error is overruled.

**{¶58}** Judgment is affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY EILEEN KILBANE, JUDGE

EILEEN A. GALLAGHER, P.J., and
MELODY J. STEWART, J., CONCUR